IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| Midcontinent Livestock Supplements, | ) | |
|  Inc., a Missouri Corporation, | ) | |
| | ) | |
| Plaintiff, | ) | **FINDINGS OF FACT AND** |
| v. | ) | **CONCLUSIONS OF LAW** |
| | ) | |
| | ) | Case No. 3:04-cv-015 |
| Modern Livestock Specialites, Inc; | ) | |
| Orwig's MLS Tubs, Inc.; Steven Orwig, | ) | |
| and Mary C. ("Marcy") Orwig, | ) | |
| | ) | |
| Defendants. | ) | |

**FINDINGS OF FACT**

1.  This action was commend by the filing of a complaint on February 19, 2004.

2.  Defendants filed a counterclaim on April 20, 2004.

3.  Plaintiff Midcontinent Livestock Supplements ("Midcontinent") was founded in 1987 in Missouri by Raymond Orwig, Sr., to manufacture and sell molasses-based livestock feed supplements.  (Trial Transcript, hereinafter "T." at 9-10, 113, 145-46).

4.  Since its inception in 1987, Midcontinent has continuously manufactured and marketed a livestock feed supplement under the mark "MLS."  (T. 9-10, 145-46).

5.  Midcontinent has used the mark MLS both in connection with the name Midcontinent, as well as a stand-alone mark.  Midcontinent has also used the MLS mark both alone and in conjunction with the cow/calf logo.  (T. 15, 146-153; Plaintiff's Exhibit, hereinafter "Pltf. Exs." at 8, 31, 34, 35, 38, 39).

6.  Midcontinent's product is a molasses-based livestock feed supplement.  It is manufactured pursuant to a patented technology.  The supplement is often placed in a container,

such as a bucket or a tire.  This supplement is known in the industry as "MLS tubs" or "MLS product."  (T. 113, 125, 146, 315-16).

7.  Midcontinent has been the sole user of the MLS mark in the livestock feed supplement industry, aside from licensed uses by Midcontinent's distributors and dealers.  (T. 10, 15-16, 85, 125-26, 167, 486-88).

8.  Defendants allege that three livestock feed supplement companies use the MLS mark. Two of the companies, Milliron Livestock Supplements and Meyers Livestock Supplements, are in Canada and do not conduct business dealings in the United States.  (T. 486-88).  The other company, Midwest Livestock Systems, had never sold livestock feed supplements and is now defunct.  (T. 486-88).

9.  Midcontinent's exclusive use of the mark MLS since 1987 has caused the mark to be associated with Midcontinent and its products.  (T. 146, 318-19, 340, 455-56; Pltf. Ex. 39).

10.  Defendant Steve Orwig testified that people in the industry refer to Midcontinent as MLS and also refer to Midcontinent's product as MLS product.  (T. 146).

11.  During her time as director of national sales for Midcontinent, Marcy Orwig referred to Midcontinent as MLS and used MLS interchangeably with the name Midcontinent in advertising literature she created for the company.  (T. 64-65, 149-51, 159-160, 469-72; Pltf. Exs. 31, 34, 35, 38, 39).

12. Prior to 1992, Steven Orwig was either employed by Midcontinent or worked as an independent distributor of Midcontinent products.  (T. 17-18, 154-57, 172-74, 223, 225, 283-84, 472-73).

13.  In 1989, Steven and Marcy Orwig moved to Alliance, Nebraska, where Steve and two partners formed a company, then called MLS Nebraska.  While not owned by Midcontinent, it

licensed technology from Midcontinent and sold MLS product.  (T. 125, 156, 315-16).

14.  In 1989, Marcy Orwig created a design that was later used by MLS Nebraska.  This design featured a silhouette of the front portions of a cow and calf, and is referred to as the "cow/calf logo."  (T. 311, 411, 412).

15.  Marcy Orwig was not an employee of Midcontinent or MLS Nebraska when she created the cow/calf logo currently at issue.  Marcy Orwig created the design in her home in Fairbury, Nebraska for the purpose of replacing the logo used by Harlan Doeschott's livestock feed supplement company.            .

16.  Midcontinent adopted this cow/calf logo under the encouragement of Steven Orwig.  (T. 169-70).  This use began in approximately 1989, before Raymond Orwig, Sr.'s death in 1991.  (T. 26, 115).

17.  The employment relationship between Steven Orwig and MLS Nebraska ended in 1990.  (T. 312-14).  After this, but still in 1990, Steven and Marcy Orwig worked with a Midcontinent distributor in South Dakota as an employee of Midcontinent.  (T. 17-18, 157, 223, 225).

18.  Midcontinent eventually formed a subsidiary, MLS Dakota, and began construction of a manufacturing plant in Ellendale, North Dakota.  This facility opened in 1993.  (T. 159).

19.  Steven and Marcy Orwig, as employees of Midcontinent, oversaw the construction of the Ellendale plant.  Steven Orwig became head of sales and Marcy Orwig became plant manager.  In 1997, Steven Orwig became National Sales Manager for Midcontinent and Marcy Orwig became National Promotions Director for Midcontinent.  (T. 159-60).

20.  Under the management of Steven and Marcy Orwig, MLS Dakota adopted the cow/calf logo as part of its trademark and has used it since 1993.  (T. 83-84, 425-26, 467).

21.  Midcontinent used the cow/calf design as part of its trademark since 1989 or 1990.  (T. 26-28, 83-84, 115, 128, 465-66).  Midcontinent has expended money to promote the logo design as its trademark.

22.  The cow/calf design has come to represent Midcontinent among livestock feed supplement customers.  (T. 48, 115-16, 128, 174).  Steven Orwig has admitted this, and has stated that a rancher who saw the cow/calf logo and MLS mark would recognize them as representing Midcontinent.  (T. 174, 191-92; Pltf. Ex. 43).

23.  Midcontinent used the cow/calf logo for over a decade before applying for a federal trademark in September 2001.  (T. 131).  Midcontinent received the federal trademark registration in 2003.  (T. 32-33; Pltf. Ex. 49).

24.  Defendants never objected to the use of the cow/calf logo by Midcontinent prior to the February, 2004 commencement of the current action.  (T. 30-32, 37, 84-85, 115-17, 124, 170-71, 286-87, 468-69).  Defendants objected to Plaintiff's removal of a copyright symbol ("©") Marcy Orwig had placed on the cow/calf logo.  Defendants were aware of the removal of the copyright symbol, but never withdrew permission to use the logo.  (T. 28-29, 116-17, 286-87).

25.  Steven and Marcy Orwig left employment with Midcontinent in 2000 and formed Modern Livestock Specialties ("Modern").  Modern was created to be the exclusive distributor of all products produced at Midcontinent's Ellendale facility.  (T. 34-35, 77, 99, 118, 131-32, 163-64, 293, 365, 427).

26.  The name "Modern Livestock Supplements" was specifically chosen so that the company could utilize the initials MLS.  This was done to maintain continuity with Midcontinent customers and to capitalize on Midcontinent's reputation for quality.  (T. 162-63, 175, 294-95, 340).  Each of companies formed by Defendants have utilized the initials MLS for the same reason.

4

27.  Midcontinent approved Modern's use of the MLS mark as Modern was an exclusive distributor of Midcontinent's products.  Midcontinent regularly encouraged its dealers and distributors to utilize the MLS mark in connection with the marketing of MLS product.  (T. 35, 72, 125-27).

28.  After one year, the board of Midcontinent terminated its written distribution agreement with Modern, although the companies continued to operate under substantially similar terms until 2003.  (T. 36-37, 290).

29.  In October 2003, Modern terminated its relationship with Midcontinent in its entirety and began construction of a competing plant in Ellendale, North Dakota.  This facility opened in March of 2004.  Modern continued to use the MLS mark and federally registered logo, despite the fact that permission to use both had been terminated.  (T. 445-46).

30.  After the severance from Midcontinent, Modern wrote to their customers, but did not inform those customers that Modern was no longer associated with Midcontinent and no longer carried Midcontinent product.  (T. 164-65; Pltf. Ex. 21).

31.  Defendants now operate chiefly through two entities, Orwig's MLS Tubs, Inc., which manages the production facility, and MLS International, Inc., which is the sales arm, and interacts with the consuming public.  (T. 17-18, 154, 156-57, 172-74, 445-46, 473).

32.  Defendant Modern has, on two occasions, attempted to ship their products into Canada by using Midcontinent's Canadian registration number.  (T. 93-94; Pltf. Exs. 68, 70).

33.  Modern has sold a product containing Rabon, which requires an EPA registration number.  Modern has placed Midcontinent's registration number on products containing Rabon. (Ex. 61).

34.   Modern has received payments for products that were intended for Midcontinent. Marcy Orwig stated that there is an misdirection rate of about 5 percent.  (T. 504; Pltf. Ex. 64).

35.   Further, on four occasions, goods and services purchased by Modern were charged to Midcontinent.  All of these transactions were performed by the same employee of Modern.  It is unclear whether this was the result of deliberate fraud or merely incidences of confusion by third party vendors.  (T. 91-93; Pltf. Exs. 65, 66, 67, 71).

36.   Defendants have also used Raymond Orwig, Sr. in advertising as to suggest that Defendants are themselves, or are representatives of, the business he established.  (T. 179-83; Pltf. Ex. 56).

37.   Most of the products sold by Modern use the same or similar name and number system used by Midcontinent to identify their own products.  (T. 193-94).

38.   Both Midcontinent and Modern target the same customers and do business within the same channels of trade.  (T. 175).

## CONCLUSIONS OF LAW

1.   The Court has jurisdiction of the subject matter and the pursuant to 28 U.S.C. § 1331.

2.   Midcontinent has been the exclusive user of the mark MLS, having used the mark in conjunction with the marketing and use of their product since 1987.

3.   MLS is a descriptive name and is subject to trademark protection as the mark has gained secondary meaning in the minds of its customers.  This secondary meaning arises out of the uninterrupted, exclusive, and substantial use by Midcontinent in connection with the marketing of their products throughout the Midwest.

4.   Defendant's use of Midcontinent's MLS logo is likely to cause, and has caused,

customer and vendor confusion.

5.  Marcy Orwig has asserted copyright ownership of the logo.

6.  Marcy Orwig was not employed by Midcontinent or its subsidiaries, distributors, or agents when she produced the cow/calf logo and her copyright is valid.

7.  Steven and Marcy Orwig encouraged Midcontinent's use of the cow/calf logo, creating an non-exclusive oral license of the use of the cow/calf logo in favor of Midcontinent.

8.  Midcontinent used the cow/calf logo with Marcy Orwig's full knowledge and consent for a period of almost 15 years.

9.  At no time during the period of use has Marcy Orwig or any other Defendant objected to the use of the cow/calf logo.  This failure to object continued for a year after Midcontinent had received federal registration of the cow/calf logo.

10.  Denial of Midcontinent's use of the cow/calf logo would confuse consumers and bestow a windfall on any subsequent users of the logo, including the Defendants.

11.  Defendants are estopped from claiming copyright infringement by their conduct.

12.  Modern's use of the MLS mark and the cow/calf logo has infringed upon the trademark held by Midcontinent.

13.  Midcontinent is entitled to injunctive relief in its favor barring Defendants from using the MLS mark or the cow/calf logo as well as any mark confusingly similar to the above referenced marks.

14.  The Defendants' action for cancellation of the registration of the marks registered with the U.S. Patent and Trademark Office is without merit.

15.  The Defendants' registration of marks "MLS" and "MLS Tubs" with the North Dakota Secretary of State is contrary to law, as the marks are the property of Midcontinent, and the North

Dakota Secretary of State is hereby directed to strike the registrations as being granted contrary to law.

16.  Midcontinent is entitled to damages against the Defendants in the amount of $50,000.


## ANALYSIS

### Viability of "MLS" as a trademark

A common law trademark arises from the adoption and actual use of a word, phrase, logo, or other device to identify and distinguish goods or services with a particular company.  See Allard Enter. v. Advanced Programming Res., Inc. 249 F.3d 564, 571 (6th Cir. 2001); First Bank v. First Bank Sys., Inc., 84 F.3d 1040, 1044 (8th Cir. 1996); 15 U.S.C. §1127 ("The Lanham Act").  In order to establish trademark infringement under Section 43(a) of the Lanham Act, a plaintiff must show that it has a protected trademark and that use of an allegedly infringing mark is likely to cause customer confusion.  Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc., 182 F.3d 598, 601 (8th Cir. 1999).  The North Dakota Supreme Court has adopted the same standard for proving trademark infringement under North Dakota law.  KAT Video Productions, Inc. v. KKCT-FM Radio, 560 N.W.2d 203, 208 (N.D. 1997)

Midcontinent has been the exclusive user of the mark MLS, having continually used the mark in conjunction with the marketing and sale of their product since 1987.  Defendants made prior use of the MLS mark as either employees of Midcontinent or as distributors of Midcontinent's products.  After 2003, Defendants marketed non-Midcontinent product under the MLS mark.  As such, Plaintiff is the senior user of the MLS mark.

The level of protection afforded a mark is proportionate to is level of distinctiveness.  See General Mills, Inc., v. Kellogg Co., 824 F.2d 622, 625 (8th Cir. 1987).  There are four categories of

distinctiveness: (1) generic; (2) descriptive; (3) suggestive; and (4) arbitrary or fanciful.  Duluth
News-Tribune v. Mesabi Publ'g Co., 84 F.3d 1093, 1096 (8th Cir. 1996); General Mills, 824 F.2d
at 625.  The Eighth Circuit describes the differences among the classifcations:

> An arbitrary of fanciful trademark is the strongest type of mark
> and is afforded the highest level of protection.  At the other end
> of the spectrum, a generic term is one that is used by the general
> public to identify a category of goods, and as such merits no
> trademark protection.  Suggestive and descriptive marks fall
> somewhere in between.  A suggestive mark is one that requires
> some measure of imagination to reach a conclusion regarding the
> nature of the product.  A descriptive mark, on the other hand,
> immediately conveys the nature or function of a product and is
> entitled to protection only if it has become distinctive by
> acquiring a secondary meaning.

Duluth News-Tribune, 84 F.3d at 1096 (internal citations omitted).  The categorization of a specific
term or phrase is a factual issue.  Anheuser-Busch, Inc. v. Stroh Brewery Co., 750 F.2d 631, 635
(8th Cir. 1984).  This Court finds that MLS is a descriptive name.

Terms that are merely descriptive are not entitled to protection absent a showing of
secondary meaning.  G. Heilman Brewing Co. v. Anheuser-Busch, 873 F.2d 985, 991-92 (7th Cir.
1989).  Though a mark may be merely descriptive, it can be used in business long enough to
generate sufficient reputation and goodwill as to establish this secondary meaning in the minds of
customers.  The mark must be of sufficient duration and quality that the mark identifies not simply
the product, but the actual producer.  See Gilbert/Robinson, Inc. v. Carrie Beverage-Missouri, Inc.,
758 F. Supp. 512, 522 (E.D. Mo. 1991); D.C. Comics v. Powers, 465 F. Supp. 843, 846 (S.D.N.Y.
1978); 15 U.S.C. § 1052(f) (proof of substantial, continuous, and exclusive use of a mark for five
years is prima facie evidence that the mark has become distinctive of the owner's good or service).
The MLS mark, by virtue of its long (since 1987) and exclusive association with Midcontinent,  has

acquired secondary meaning in the minds of its consumers.  This is supported by testimony offered

by Plaintiff that MLS is recognized throughout the industry as representing Midcontinent.  (T. 318-

19, 340, 455-56; Pltf. Ex. 39).  Defendant Steven Orwig admits the same. (T. 146).


### Defendants' use of the MLS mark creates a likelihood of confusion

 In order to prevail to prevail in a trademark-infringement claim, the plaintiff must show a

likelihood of consumer confusion.  Minnesota Mining & Manufacturing Company v. Rauh Rubber,

Inc., 130 F.3d 1305, 1308 (8th Cir. 1997).  Likelihood of customer confusion is the "hallmark of

any trademark infringement claim."  Id.  (citing Polymer Technology Corp. v. Mimran, 37 F.3d 74,

80 (2d Cir. 1994)).

 In determining whether there exists a likelihood of customer confusion, the Court considers

the following: (1) the strength of the owner's mark, (2) the similarity of the owner's mark and the

mark of the alleged infringer, (3) the degree to which the products compete with one another, (4) the

alleged infringer's intent to pass its goods off as those of the trademark owner, (5) incidents of

actual confusion, and (6) whether the degree of purchaser care can eliminate any likelihood of

confusion which would otherwise exist.  Life Technologies, Inc. v. Gibbco Scientific, Inc., 826 F.2d

775, 776 (8th Cir. 1987) (citing Squirtco v. Seven-Up Co., 628 F.2d 1086, 1091 (8th Cir. 1980)).  A

determination of customer confusion does not turn on any one factor.  Squirtco, 628 F.2d at 1091

(citing Gotrian, Helferrich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons, 523 F.2d 1331 (2d

Cir. 1975)).  Nor should any factor should be afforded excessive weight at the expense of any other

factor.  Life Technologies, 826 F.2d at 776 (citing Calvin Klein Cosmetics Corp. v.  Lenox

Laboratories, Inc., 815 F.2d 500, 504 (8th Cir. 1987)).

 In examining the first factor, this Court concludes that MLS is a fairly strong mark.  While

the mark is not comparable to marks of international recognition, such as IBM, GE, or BMW, it is sufficiently recognized to permit advertising wherein the initials MLS, rather than the full company name, are mentioned.  (Pltf. Exs. 35, 39).  In short, in its industry niche and geographic area, MLS has come to represent Midcontinent Livestock Supplements.

In addressing the second factor, the Court finds that the competing MLS marks are identical and that the full, formal names of the companies are extremely similar.  The Court also notes when the competing products are analogous in nature, less similarity between the parties' competing marks is needed to support a finding of infringement.  Id. (citing Fleischmann Distilling Corp. v. Maier Brewing Co., 314 F.2d 149, 157-58 (9th Cir. 1963)).  Defendants' use of the MLS mark leaves little room for distinction between the two companies or their products.  The Court further reads the addition of "Orwig's" to the front of MLS as to likely create more confusion, rather than less.  By Defendant Steven Orwig omitting his first name from the name "Orwig's MLS Tubs," a customer could easily mistake the product as one produced by Midcontinent, as Midcontinent was founded and run by Raymond Orwig, Sr. until his death, and is run by the Orwig family today.  The Court finds that this factor leans heavily towards a likelihood of customer confusion.

The third factor also weighs in favor of a likelihood of customer confusion.  Both Midcontinent and Modern manufacture and sell a molasses-based feed supplement, designed for consumption by ruminant livestock.  The products compete in the same geographic area, indeed the parties are direct competitors.  Further, this Court finds that Modern intended to pass its goods off as Midcontinent products, or, at a minimum, wished to convey the image that Midcontinent authorized or otherwise endorsed Modern's products.  Modern not only utilized the mark MLS, but also omitted Steven Orwig's first name in its marketing in order to create the image that "Orwig's MLS Tubs" was a product created by the company of Raymond Orwig, Sr.  Steven Orwig stated

11

that the rationale behind selecting the name Modern was to mimic the mark MLS and, in so doing, to capitalize on Midcontinent's/MLS's reputation for quality and to maintain continuity with customers.  (T. 162-63, 175, 294, 340).

The record also shows instances of actual customer confusion.  Modern has received payments for products that were intended for Midcontinent, and have stated that there is an misdirection rate of about 5 percent.  (T. 295, 504, Pltf. Ex. 64).  There has also been possible mistakes in billing by third parties, having sent remittance to Midcontinent rather than Modern.  (T. 91-93; Pltf. Exs. 65, 66, 67, 71).  This Court accords great weight to these instances of actual confusion.  "Actual confusion is not essential to a finding of trademark infringement, although it is positive proof of a likelihood of confusion."  Squirtco, 628 F.2d at 1091.  The Court finds that this factor weighs strongly in favor of finding of customer confusion.

In addressing the last factor, that of consumers' ability to avert future confusion, the Court is mindful of the relative sophistication of the Midcontinent and Modern's customers.  As commercial cattle producers, these consumers can be expected to pay a great deal of attention to their supplement suppliers.  It is unlikely that these customers would repeatedly make mistaken purchases.  This factor tends to weight against a finding of customer confusion.

In balancing these factors, the Court finds that there is a likelihood of customer confusion.  The Court has already concluded that Midcontinent has a valid trademark in the MLS mark.  The Court thus concludes that Defendants' use of the MLS mark constitutes trademark infringement.

**Use of Cow/Calf Logo**

The Copyright Act defines a "transfer of copyright ownership" to consist of "an assignment, mortgage or an exclusive license, or any other conveyance, alienation, or hypothetication of a

12

copyright or of any of the exclusive rights comprised in a copyright...but not including a nonexclusive license." 17 U.S.C. § 101.  A transfer other than by one by operation of law "is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed..." or, as a substitute, "a note or memorandum of the transfer." 17 U.S.C. § 204(a).  A written instrument, however, is not required when the copyright transfer is not one of ownership.  While ownership is construed broadly, nonexclusive licences are explicitly omitted from the requirement that a transfer be in written form. Effects Assoc. v. Cohen, 908 F.2d 555, 558 (9th Cir. 1990); 17 U.S.C. § 101.  Thus, a non-exclusive license may be granted orally, or, more rarely, one may be inferred from conduct that indicates the copyright holder's intent to allow the licencee to use the work.  John G. Danielson, Inc. v. Winchester Conant Props., Inc., 322 F.3d 26, 31-32 (1st Cir. 2003).  The burden of proving the existence of a license rests on the party seeking its protection.  Bourne v. Walt Disney Co., 68 F.3d 621, 631 (2d Cir. 1995).  In an exclusive license, the copyright holder permits the licensee to use the specified material for a specific use and further promises that the same permission will not be given to others.  I.A.E., Inc. v. Shaver, 74 F.3d 768, 775 (7th Cir. 1996).  By contrast, a copyright owner who grants a nonexclusive license gives permission to the licensee to merely use his copyrighted material, retaining the right to use, reproduce, or create derivative works from the original copyrighted image. Kennedy v. National Juvenile Detention Ass'n, 187 F.3d 690, 694 (7th Cir. 1999). Because Steven Orwig admitted that he and his wife encouraged Midcontinent to adopt and use the cow/calf logo, the Court finds that there is indeed a license.  Because Midcontinent has not produced any written instrument or agreement, the Court also finds that the license was oral, and therefore was a nonexclusive license.  The grantor of a license waives his right to sue the licencee for copyright infringement.  Graham v. James, 144 F.3d 229, 236 (2d Cir. 1998).

Even assuming that no implied oral license was created, however, Defendants still may not assert a copyright infringement claim as they are barred by the principles of estoppel. A four-element test has arisen to govern whether a party is estopped from asserting infringement: 1) the plaintiff must know the facts of the defendant's infringing conduct; 2) the plaintiff must intend that its conduct shall be acted upon or must so act that the defendant has a right to believe that it is so intended; 3) the defendant must be ignorant of the true facts; and 4) the defendant must rely on the plaintiff's conduct to its injury. Carson v. Dynegy, Inc., 344 F.3d 446, 453 (5th Cir. 2003).

As to the first element, it cannot be seriously contended that Defendants were not aware of Plaintiff's near 15 year use of the cow/calf logo, particularly considering the high level of responsibility that Defendants enjoyed at Midcontinent. Marcy Orwig herself created advertisements that featured the cow/calf logo and had served as National Promotions Director, a position that inevitably involves the dissemination of a company's promotional materials and concomitant logo. The second element is also met. Steven Orwig encouraged Midcontinent to adopt the cow/calf logo. (T. 169-70). Further, Marcy Orwig, while National Promotions Director, actually oversaw the production and distribution of promotional materials with the cow/calf logo.

The third element is satisfied as well. Midcontinent used the logo for close to 15 years before Marcy Orwig withdrew her permission. Further, Steve and Marcy Orwig were employees of Midcontinent when Midcontinent filed for trademark registration of the cow/calf logo and the MLS mark. Despite Defendant's knowledge of both the use and registration of the mark, they did not object to such use until 2004. The fourth element is also satisfied. Midcontinent has built a solid customer base during the approximately 15 years it operated with the cow/calf design as its logo. Bound up in these dealings is a certain amount of recognition and goodwill. To now deprive Midcontinent of the use of the logo would only confuse customers and bestow a windfall to any

14

subsequent user of the cow/calf logo.  The Court finds that all of the above elements are satisfied,

and that Defendants are therefore estopped from claiming copyright infringement.

Defendants have also attacked the validity of the trademark's registration, asserting that it

obtaining by fraud as it incorporated Marcy Orwig's cow/calf image.  Defendants' claims, here too,

chafe against the doctrine of estoppel.  By using the trademark in commerce, a party acknowledges

the validity of the mark, and is estopped from later asserting otherwise.  Heaton Distribution Co. v.

Union Tank Car Co., 387 F.2d 477, 482 (8th Cir. 1967); see also Pacific Supply Coop. v. Farmers

Union Central Exch., Inc., 318 F.2d 894, 908-09 (9th Cir. 1963).  Defendants utilized the cow/calf

logo post-registration to promote the products of Midcontinent and are estopped from attacking the

validity of the registration after the fact.

While Defendant retains a copyright in the cow/calf logo, their use of the image to promote

livestock feed supplements constitutes infringement of Midcontinent's trademark.  Such a mark is

composed not merely of a drawing or image, but rather the goodwill it has created through the

course of its business dealings.  As the Sixth Circuit explains:

> ...[A] trade-mark is generally the growth of a considerable period of
> use rather than a sudden invention; and the exclusive right to it
> grows out of its use and not its mere adoption.  The purpose of the
> trade-mark is to permit people to build up their businesses around
> trade names by which articles are known, and establish goodwill;
> and it is the goodwill, not the mark, that is protected.

E.F. Pritchard Co. v. Consumers Brewing Co., 136 F.2d 512, 518 (6th Cir. 1943) (internal citations

omitted).  Midcontinent has used the cow/calf logo for close to 15 years, during which time it has

had extensive contacts and dealings with livestock producers across the Midwest.  To allow another

company to use the mark in the livestock supplement business would serve only to diminish the

value of their mark and to confuse customers.  The Court thus finds that Modern has infringed upon

the trademark of Midcontinent through its use of the initials MLS and the cow/calf logo in the

livestock feed supplement industry.

### Appropriate Remedies

Once it has been established that there has been unlawful use and a likelihood of consumer

confusion, irreparable injury is presumed as a matter of law.  General Mills, Inc. v. Kellogg Co.,

824 F.2d 622, 625 (8th Cir. 1987); Black Hills Jewelry Mfg. Co. v. Gold Rush, Inc., 633 F.2d 746,

753 (8th Cir. 1980); McCarthy on Trademarks § 25.31 (4th ed.) (Irreparable harm *always* flows

from unlawful use and confusion.") (emphasis in original) (quoting Church of Scientology Int'l v.

Elmira Mission of the Church of Scientology, 794 F.2d 38, 43 (2d Cir. 1986)).  When a former

licensee continues to use a mark after the termination of the license, "a finding of irreparable harm

is automatic."  Church of Scientology Int'l, 794 F.2d at 42.

"It is generally said that once infringement of a trademark is shown, the owner of the mark is

entitled to injunctive relief.  Indeed, when the infringement is clear and deliberate, such relief is

denied only in the most unusual of cases."  United States Jaycees v. Cedar Rapids Jaycees, 794 F.2d

379, 382 (8th Cir. 1986).  Further, under the Lanham Act, a successful plaintiff my recover (1)

Defendant's profits, (2) Plaintiff's damages, and (3) the costs of the action.  15 U.S.C. §1117(a).

Here, however, Plaintiff has sought only to recover Defendants' profits and the costs of the action.

The Lanham Act provides that the Court may assess damages for any amount up to three times the

actual damages.  Id.  The Lanham Act, however, affords great latitude to the Court in determining

appropriate damages. "If the Court shall find that the amount of recovery based on profits is either

inadequate or excessive the court may in its discretion enter judgment for such a sum as the court

shall find to be just, according to the circumstances of the case."  Id.  The Court finds that it would

16

be unreasonable to ascribe all of the Plaintiff's reduced profits to Defendants' infringing use.
Rather, a sizable portion of Plaintiff's reduced profits stems from the simple facts that Plaintiff had
to contend with a new competitor.  Further, Defendant conducted a large share of its business with
established customers.  The Court also finds that Defendants' allegation that it earned no profit
during the two years of infringing use to be equally unreasonable.  Thus, the Court will exercise is
purview under the Lanham Act to assign damages that are just which, here, would be $50,000,
given the circumstances of this case.


**IT IS HEREBY ORDERED:**

　　1.  This Court permanently enjoins the Defendants from using the mark MLS and the
cow/calf design, either in conjunction with one another, or separately in the livestock feed
supplement industry.  The Defendant is further enjoined from using any marks confusingly similar
to the above marks.

　　2.  This Court directs the Patent and Trademark Office to dismiss Defendants' cancellation
proceeding, and to dismiss Defendant's pending trademark for MLS and design.

　　3.  The Court directs the North Dakota Secretary of State to extinguish all of the Defendants'
registration of corporate and trade names containing the marks "MLS," and "MLS Tubs" and to
register "MLS" and "MLS Tubs" as trademarks of Midcontinent Livestock Supplements, Inc.

　　4.  The Court also awards damages in the amount of $50,000.  The Court declines to award
costs and attorney's fees.

　　5.  The Court dismisses Defendants' counterclaim for copyright infringement with prejudice.

17

**LET THE JUDGMENT BE ENTERED ACCORDINGLY.**

Dated this <u>6th</u> day of July, 2006.




Ralph R. Erickson, District Judge
United States District Court